IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 2, 2021

**IN RE HAYDEN F.**

**Appeal from the Circuit Court for Bradley County
No. V-19-413    Larry H. Puckett, Judge**

_____

**No. E2020-00872-COA-R3-PT**

_____

The trial court terminated a mother's parental rights to her children on the grounds of (1) abandonment by willful failure to visit, (2) abandonment by willful failure to support, and (3) persistence of conditions.  The trial court also found that termination of the mother's parental rights was in the best interest of the children.  Although we reverse one of the termination grounds, we affirm the trial court's conclusion that clear and convincing evidence supports a finding of abandonment by willful failure to support and a finding of persistence of conditions.  We also affirm the trial court's determination that the termination of the mother's rights is in the best interest of the children.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Reversed in Part, Affirmed in Part; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which ANDY D. BENNETT, J., and J. STEVEN STAFFORD, P.J., W.S., joined.

Wilton A. Marble, Jr., Cleveland, Tennessee, for the appellant, Kara C.

Philip M. Jacobs, Cleveland, Tennessee, for the appellees, Thomas Joseph F. and Whitney Nicole F.

Amy Campbell, Cleveland, Tennessee, Guardian _ad litem_.

## OPINION

## I.  BACKGROUND

Hayden F. and Thomas F. ("the Children") were born out of wedlock to Kara C. ("Mother") and Thomas Joseph F. ("Father") in 2011 and 2013, respectively.  Father and Mother lived together from the birth of the oldest child until September 2015.  Following Mother and Father's breakup, they agreed to shared visitation and Father visited the Children.  Appellee Whitney Nicole F. ("Stepmother") married Father in May 2017.  They have one child born of their marriage.  Stepmother helped care for the Children before she married Father.

By her own admission, Mother has a history of drug use, including methamphetamine.  In June 2016, the Tennessee Department of Children's Services ("DCS") removed the Children from Mother's home.  Following a hearing, the Bradley County Juvenile Court adjudicated the Children as dependent and neglected.  At the time, Mother agreed that, given her drug use, the Children's best interest would be served by Father having custody, so Father gained temporary custody of the Children by court order.  Mother was ordered to complete certain requirements before requesting a return of custody or unrestricted contact with the Children, including: (a) completing an alcohol and drug assessment and following all recommendations; (b) submitting to random drug screening; (c) completing counseling; (d) maintaining a legal source of income; (e) maintaining stable housing; (f) completing parenting classes; (g) cooperating with DCS and/or service providers; (h) maintaining regular contact and visitation with the Children as allowed by the court's order;[1] (i) financially supporting the children at all times that they were not in Mother's custody; and (j) complying with all court orders in this and any other matter.

After the Children's removal, Mother did not attempt to meet most of the above requirements, nor did she ever seek to reestablish custody of the Children.  She continued to use methamphetamine until December 2016.  She also used marijuana.  From the time the Children were transferred to Father's custody, Mother changed phone numbers seven times and lived in four different residences.  At one point, Mother lived with her father and then briefly lived with a friend.  She did, however, work off and on as a babysitter beginning in the summer of 2016, earning modest wages.   In April, May, and June of 2019, Mother worked part-time at a deli, earning $8.00 an hour.  Mother failed to pay any child support to Father after the Children were removed from her custody and she was aware that he petitioned for child support payments in January 2019.  Mother did not pay child support after Father commenced the child support action.  Mother did not maintain

---

[1] The juvenile court ordered Father to supervise all contact with Mother pending further order of the court.

regular contact and visitation with the Children and was largely absent from their lives, though she asserts that Father is partially to blame for this. Mother has another child, born in 2019, by another man with whom she is not in a relationship.

The proceedings underlying this appeal began on August 5, 2019, upon Father and Stepmother's filing of a Petition for Termination of Parental Rights and Step Parent Adoption. Mother answered the petition. The case proceeded to trial on March 3, 2020. Father, Mother, their mutual acquaintance, Stepmother, Stepmother's mother, the Children's paternal grandfather, the Children's maternal grandmother, and the Children's paternal great grandmother testified.[2] At the time of trial, Mother was twenty-five years old and had for approximately two years been living in a home with her mother, her mother's boyfriend, and her younger sister. Two weeks before trial, she secured a job as a direct support professional working with mentally ill patients. The Children were then eight and seven years old, and a guardian *ad litem* represented their interests.

By order entered March 5, 2020, the trial court found clear and convincing evidence that Mother "abandoned the two children by failing to support them financially (T.C.A. 36-1-102(1)(A)(i) and T.C.A. 36-1-113(g)(1)) for four months preceding the filing of the Petition." The trial court further found that Mother had not proven by a preponderance of the evidence the affirmative defense that her failure to support the Children was not willful.[3] However, the trial court "found Mother had proven her defense to abandonment for failure to visit the children by a preponderance of the evidence due to Father's having intentionally thwarted her visitation." The trial court further found "by clear and convincing evidence Mother's drug use persisted and concluded this to be a persistent condition under T.C.A 36-1-113(g)(3)(A)." Nevertheless, the trial court instructed the parties to submit proposed findings of fact and conclusions of law on whether termination was in the Children's best interest, to brief and further argue the ground of persistence of conditions, and to brief "any other matters counsel may wish to bring to the Court's attention."

On May 26, 2020, the trial court partially modified its previous order. The previous finding of Mother's willful failure to support the Children remained unchanged. The court found that "the ground of persistence of conditions has been shown by clear and convincing evidence." However, the trial court reversed the finding that Mother had proven that her failure to visit the Children was not willful because "it is reasonable for [Mother] not to have pressed for visits while she was using (abusing) drugs and it is reasonable for Father to suppress and deny Mother's contact with the children while she

---

[2] The testimony will be discussed in greater detail below as relevant to the issues on appeal.

[3] In her answer, Mother asserted the affirmative defenses that her alleged failure to support and failure to visit the Children were not willful.

was using." The court found that Father's conduct did not amount to improper interference with Mother's visitation, but that it "was consistent with his responsibility under the Juvenile Court's Adjudicatory Order to supervise Mother's contact with the children and restrict it." Thus, the trial court found that Mother's failure to visit amounted to "willful abandonment by clear and convincing evidence." Finally, the trial court found that termination of Mother's parental rights was in the best interest of the Children. Mother appealed.

## II.    ISSUES

Mother raises three issues: (1) Whether the trial court erred in finding that the petitioners proved by clear and convincing evidence the ground of abandonment by willful failure to visit; (2) Whether the trial court erred in finding that the petitioners proved by clear and convincing evidence the ground of abandonment by willful failure to support; and (3) Whether the trial court erred in finding that the petitioners proved by clear and convincing evidence the ground of persistence of conditions.

We will also review whether clear and convincing evidence supports the trial court's finding that termination is in the best interest of the Children pursuant to Tennessee Code Annotated section 36-1-113(i).

## III.    STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652–53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

Although parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See In Re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence

- 4 -

of the existence of the grounds for termination. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

> (1)    [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
>
> (2)    [t]hat termination of the parent's or guardian's rights is in the best interest[] of the child.

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). "Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Audrey S.*, 182 S.W.3d at 861 (citations omitted). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2016, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination

of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d 507, 523–24 (Tenn. 2016) (citations omitted); *see also In re Gabriella D.*, 531 S.W. 3d 662, 680 (Tenn. 2017).

Lastly, in the event that the "resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). "Thus, this court gives great weight to the credibility accorded to a particular witness by the trial court." *In re Christopher J.*, No. W2016-02149-COA-R3-PT, 2017 WL 5992359 at *3 (Tenn. Ct. App. Dec. 4, 2017) (citing *Whitaker*, 957 S.W.2d at 837).


## IV.   DISCUSSION

1.
*Abandonment by Failure to Visit*

Parental rights may be terminated for abandonment, as defined in Tennessee Code Annotated section 36-1-102. Tenn. Code Ann. § 36-1-113(g)(1). Abandonment can be found when a parent fails to visit a child for a period of four consecutive months immediately before the filing of a petition to terminate parental rights. Tenn. Code Ann. § 36-1-102(1)(A)(i). A failure to visit "means the failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). The statute requires that parents offer their children more than "token visitation," defined as visitation that "under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(C).

A parent may assert as an affirmative defense pursuant to Tennessee Rule of Civil Procedure 8.03 that his or her failure to visit was not "willful." Tenn. Code Ann. § 36-1-102(1)(I). Thus, the burden is on Mother to prove by a preponderance of the evidence that her failure to visit the Children was not willful. *Id.*; *In re Kolton C.*, No. E2019-

00736-COA-R3-PT, 2019 WL 6341042 at *5 (Tenn. Ct. App. Nov. 26, 2019). In the context of abandonment:

> Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. Failure to visit or to support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty, or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child[.]

*In re Audrey S.*, 182 S.W.3d at 864 (citations omitted); *see also In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009). "It is well established in Tennessee that a parent who attempts to visit and maintain relations with his or her child but is thwarted by the acts of others and circumstances beyond the parent's control has not willfully abandoned the child." *In re John A.*, No. E2020-00449-COA-R3-PT, 2021 WL 32001 at *7 (Tenn. Ct. App. Jan. 4, 2021) (citing *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007)). As we recently observed, applying the test to determine whether certain conduct amounts to a significant restraint or interference with a parent's efforts to visit or support a child "is not a mechanical process." *In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088 at *5 (Tenn. Ct. App. July 22, 2020), *perm. app. denied* (Tenn. Dec. 10, 2020). Thus, "courts faced with determining whether a significant restraint has occurred reach different conclusions based on the circumstances of each case." *Id.* at 5–6 (collecting cases).

Here, Father and Stepmother filed the petition on August 5, 2019, so the relevant four-month period is April 5, 2019, to August 4, 2019. *See In re Jacob C.H.*, No. E2013-00587-COA- R3-PT, 2014 WL 689085 at *6 (Tenn. Ct. App. Feb. 20, 2014) (statutory four-month period covers four months preceding day termination petition was filed and does not include day petition was filed). As we have previously noted, "in determining whether a parent's conduct was 'willful,' it may become necessary in a given case to evaluate events occurring prior to the start of the four-month period." *In re Brookelyn W.*, No. W2014-00850-COA-R3-PT, 2015 WL 1383755 at *9 (Tenn. Ct. App. Mar. 24, 2015). The case before us is one where "events occurring prior to the four-month period may bear on the 'willfulness' of the parent's conduct during the four-month period." *Id.*

It is undisputed that Mother did not visit the Children during the four months prior to the filing of the petition or any time after January 2018. She candidly acknowledged that for a time following the Children's removal in June 2016, she "didn't come around" and was still using methamphetamine. She explained, "mentally, emotionally I was a wreck and I didn't want to do that to the kids." Father denied that he ever told Mother

not to call or visit with the Children. Father stated that he and Mother communicated through Facebook "a lot" after he received custody of the Children. He testified that Mother's repeated threats prompted him to block her on Facebook in October 2016.

In 2017, Mother enjoyed "good" visits with the Children and she recalled that they were "happy to see [her]." Stepmother and Father characterized Mother's 2017 visits with the Children as occasional, whereas Mother stated she visited with the Children at least once a month in 2017. Father testified that, between the summer of 2016 when he received custody of the Children and January 2018, Mother visited with the Children "five, maybe six" times and called them "15, 20 times." The visits were supervised.

Mother recounted that from 2016 until 2017 she tried to ascertain Father's telephone number from her brother. After some time, Mother's brother relented and shared Father's telephone number with her. She communicated with Father through that telephone number until it became disconnected. Mother affirmed that, as early as 2017, she was aware of her right to file a petition to establish visitation and was aware that the cost would be less than $200.00. She chose not to do so, even after she could not establish contact with Father, because "money was an issue." She clarified that in 2017 she "could have" saved $200 to file a petition to establish visitation, but elected not to because she "had other things going on."

In January 2018, Mother attempted to share an overnight visit with the Children at the maternal grandmother's home, but it was cut short after Mother, her brother, and the maternal grandmother "had an argument" while the Children were within earshot.

Mother's last visit with the Children was on January 18, 2018. It was a positive visit, but at the end of it, Father told Mother to begin paying child support. He recalled that Mother cursed at him and drove off. Stepmother confirmed this testimony and recalled Father's admonition that he "would take it to court," if Mother failed to pay child support. Stepmother testified that Mother "just disappeared" after that time which caused the Children tears and heartbreak. For her part, Mother testified that Father "wouldn't let [her] see" the Children after January 2018. In what appears from the record to be one of the last discussions between the parents, Mother told Father, "as long as [she] got to see [the Children]" she "wouldn't care to give [Father] money." She decided not to pay child support "when he stopped [her] seeing—when he stopped the visitation."

Mother recalled that after January 2018 until August 2018, she tried to call and text Father, but received no response. In August 2018, Father obtained a new telephone number but did not share it with Mother. When she attempted to call Father after August 2018, she learned that his telephone number was disconnected. She then learned that Father had blocked her on Facebook. Father stated that he did not inform Mother of his

new number because "it had already been seven months with no contact" from Mother. Mother's brother, who was a co-worker of Father's, acted as the go-between. Mother's brother did not testify at trial, but the parties agree that he regularly visited the Children and was in regular contact with Father. Mother testified that "the only way [she] could get a hold of [Father] was through [her] brother." When asked how Mother could have contacted him when she did not have his new number, Father responded that "[s]he could have got it from her brother. He easily gave it to her mom." Indeed, Mother's brother had Father's new number, but even after Mother asked him "three or four times" he would not share Father's new number with her. On this point, the trial court questioned Mother:

> Q. Now, you were asked about this, but I'm going to ask again just to make sure. Did your brother conceal the whereabouts or the phone number of the father of the children from you?
>
> A. No.
>
> Q. He did not?
>
> A. Yes, he did. I'm sorry.
>
> Q. Did you ask for him to give you that information?
>
> A. Yes.
>
> Q. How often did you ask him for that?
>
> A. Every time I've asked he said he can't give it to me or he just don't want to be [involved] in it.

The Children's maternal grandmother testified that, through her son, she contacted Father around Christmas of 2018 seeking visitation with the Children. The Children visited her at home for Christmas, but Father conditioned this visit on Mother's exclusion. The maternal grandmother also recounted that Father told her that Mother "would never see" the Children and instructed Mother's brother to tell the maternal grandmother not to share the Children's address with Mother. The maternal grandmother also testified that prior to Christmas of 2018, her son made "several" attempts to facilitate visits with the Children, and recalled: "I got to go to their house to a birthday party. [Mother] wasn't allowed. We didn't get to stay very long. I mean, I felt uncomfortable. We could tell we wasn't wanted."

Mother admitted that she could have communicated with Stepmother through Facebook "the whole time [Stepmother and Father had] been together." When asked why she did not attempt to obtain Father's new telephone number from Stepmother through Facebook, Mother answered that it was not Stepmother's "responsibility." Finally, on June 28, 2019, Mother messaged Stepmother through Facebook to ask if she could please have Father call her. Mother noted her telephone number in this message. Soon afterward, Father called Mother from his new telephone number. Father testified that the reason for Mother's contact was because "her lawyer had advised her to try to visit with the children." Father declined to allow Mother to visit the Children and, by his recollection, instructed her to "wait till after the courts and everything, see how that goes." Mother did not contact Father after June 28, 2019, and it was the only time she and Father directly communicated during the four months prior to the filing of the petition. The petition to terminate her parental rights was filed approximately five weeks later.

At the end of trial, the trial court observed:

[T]here's no evidence that the reason [Father] didn't let [Mother] see the children was because she was intoxicated on some substance or not— there's no evidence he didn't want her to see the children because she was impaired. That's not in this record. Correct me if I'm wrong, gentlemen, but I don't find any testimonial evidence that said that where he said the reason he wasn't letting her see the children was because she showed up high. That's not in here. So that's—I've already made my finding on what I say was thwarting of her time with the children, so that's consistent with my finding there.

However, the trial court changed course in its final order, finding that "the fact of Mother's continued drug use is more probable than any other conclusion or explanation as to why she failed to visit her children." Thus, the court determined that "Father's conduct was consistent with his responsibility, under the Juvenile Court's Adjudicatory Order, to supervise Mother's contact with the children and restrict it."

On appeal, Mother challenges the trial court's finding. She states that "there is no evidence that father stopped visitation because of mother's drug use." We agree that the record does not support such a finding. She also correctly contends that, pursuant to the juvenile court's order, Father's role was to supervise Mother's visitation with the Children, not to unilaterally restrict it. Again, Mother has the burden to show that her failure to visit was not willful by a preponderance of the evidence. Tenn. Code Ann. § 36-1-102(1)(I). "Proving an allegation by a preponderance of the evidence requires a litigant to convince the trier-of-fact that the allegation is more likely true than not true."

*McEwen v. Tennessee Dep't of Safety*, 173 S.W.3d 815, 825 n.19 (Tenn. Ct. App. 2005) (citing *Austin v. City of Memphis*, 684 S.W.2d 624, 634–35 (Tenn. Ct. App. 1984)).

This record demonstrates that Father and Mother are both to blame for the decrease in visitation between Mother and the Children from 2017 onward. Neither kept the other informed of their new addresses or telephone numbers and both allowed anger to impede their effective communication. Mother admittedly knew that she "had the right to insist upon formal visitation via court order, [but] Tennessee law makes clear that a parent cannot significantly interfere with the noncustodial parent's visitation and still rely on the ground of failure to visit to terminate parental rights." *In re Braelyn S.*, 2020 WL 4200088 at *8 (citation omitted). The testimony shows that, more likely than not, Father hid his new telephone number and address from Mother, refused to communicate with her regarding the Children unless Stepmother or Mother's brother refereed, made her feel unwelcome, and rebuffed some of Mother's attempts at visitation. Certainly, Mother could have made a greater effort to visit the Children during the relevant four-month period, but the weight of the evidence supports a finding that Father significantly interfered with Mother's efforts at visitation. Considering the unique facts of this case, we hold that Mother established by a preponderance of the evidence that her failure to visit was not willful. We reverse the judgment of the trial court finding that the ground of abandonment by willful failure to visit was proven.

### 2.
### *Abandonment by Failure to Support*

Abandonment can occur when parents "either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child" for a period of four consecutive months immediately before the filing of a petition to terminate parental rights. Tenn. Code Ann. § 36-1-102(1)(A)(i). The statute defines failure to support as a parent's failure "for a period of four (4) consecutive months, to provide monetary support or the failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). By statute, parents are expected to offer more than "token support," which "means that the support, under the circumstances of the individual case, is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B). Furthermore, "[e]very parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children." Tenn. Code Ann. § 36-1-102(1)(H).

A lack of willfulness can constitute an affirmative defense to the ground of failure to support. Tenn. Code Ann. § 36-1-102(1)(I). However, a parent "shall bear the burden of proof that the failure to . . . support was not willful" and must establish the lack of

willfulness by a preponderance of evidence. *Id.* Efforts to frustrate or impede a parent's visitation do not justify a parent's failure to financially support a child. *In re Audrey S.*, 182 S.W.3d at 864 (citations omitted).

There is no dispute that Mother failed to pay support during the four-month period or at any time after the Children's removal in 2016. She admitted that her failure to pay was intentional:

Q. Did you ever call [Father] with the intent of setting up a time to pay him money?

A. No.

Q. Did you ever text him with the intent to pay him money?

A. No.

Q. So, you actually had no intention of paying him child support - -

A. No.

Q. - - in 2017, or in 2018.

A. Nope.

Q. And until this action was filed against you, you never had any intention of paying child support.

A. No. I did tell him as long as I got to see [the Children] I wouldn't care to give him money, but when he stopped me seeing - - when he stopped the visitation - -

Q. When you say nope or no, when I ask you a question that you had no intention of paying child support, you're saying - - you're acknowledging that you had no intention of paying.

A. Yes.

For two and a half years, Father "tried to work with [Mother] as far as child support goes and she just didn't want to pay." In January 2019, Father petitioned for child support payments. Still, Mother did not pay any support for the Children. Mother

was admittedly aware of her duty to support her Children and the record shows that she had the ability to pay some support. In this case, the testimony exposes Mother's choice to prioritize other expenditures, including the purchase of marijuana, instead of financially supporting the Children.

We conclude that Father and Stepmother proved by clear and convincing evidence that Mother willfully failed to support the Children during the relevant four-month period. Therefore, we affirm the trial court's finding of a ground for termination based on abandonment by failure to support.

### 3.
### *Persistence of Conditions*

The trial court terminated Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(3). This "persistence of conditions" ground allows courts to terminate parental rights when:

> The child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>
> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent . . . , or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent . . . ;
>
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and
>
> (iii) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3)(A).

The persistence of conditions ground "focuse[s] on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." *In re*

*Audrey S.*, 182 S.W.3d at 874. A child needs a permanent, stable environment, so "[t]he question herein is the likelihood that the child[ren] can be safely returned to the custody of the mother." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959 at *5 (Tenn. Ct. App. July 21, 2000).

The Children were previously adjudicated dependent and neglected. At the time of the termination proceedings, the Children had been removed from Mother's custody for nearly four years. Therefore, the determinative issues are whether the conditions that led to removal (or other conditions that would cause further abuse or neglect and prevent the Children's safe return) still persist; whether there is a likelihood that these conditions will be remedied at an early date so that the Children can be safely returned to Mother "in the near future"; and whether continuation of the parent-child relationship greatly diminishes the Children's chances of early integration into a safe, stable, and permanent home. *See* Tenn. Code Ann. § 36-1-113(g)(3).

The record contains clear and convincing evidence that the conditions preventing the Children's safe return to Mother remained. This is because, despite nearly four years of time, Mother made less than a determined effort to improve the conditions that led to the Children's removal, so she has minimal results to show for it. The trial court found that Mother did not comply with the requirements set forth in the adjudicatory order, particularly by failing to support the Children and by failing to undergo drug assessment and treatment. At trial, she admitted that she did not seek counseling as instructed. The trial court found that "Mother's testimony of her sobriety and freedom from drug abuse cannot be believed in the face of contradictory testimony from her own mother, Cindi C[.], that she observed her daughter to be under the influence of drugs four or five months before trial." This is a credibility finding to which we must give "great weight." *In re Christopher J.*, 2017 WL 5992359 at *3 (citing *Whitaker*, 957 S.W.2d at 837).

Mother testified that she would need an additional "six months" to make significant progress on the requirements set forth in the adjudicatory order. The evidence clearly and convincingly supports the trial court's finding that the conditions that led to removal, or other conditions that would cause further neglect and prevent the Children's safe return to Mother's care, were unlikely to be remedied at an early date. Although we acknowledge the progress Mother has made since 2016, having carefully studied the record, we find clear and convincing evidence that the continuation of Mother's relationship with the Children would greatly diminish their ability to integrate into Father and Stepmother's safe, stable, and permanent home. We affirm the trial court's finding of a ground for termination based on persistence of conditions.

- 14 -

*Best Interest of the Children*

Having concluded that there was clear and convincing evidence supporting at least one statutory ground of termination, we must consider whether termination was in the best interest of the Children. *See* Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860. In making this determination, we are guided by the following non-exhaustive list of factors:

> (i)   In determining whether termination of parental or guardianship rights is in the best interest of the child . . . the court shall consider, but is not limited to, the following:
>
> > (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> >
> > (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> >
> > (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> >
> > (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> >
> > (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> >
> > (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> >
> > (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

- 15 -

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to [section] 36-5-101.

Tenn. Code Ann. § 36-1-113(i). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

On appeal, Mother contends that the trial court should not have considered the best interest factors because no ground for termination was proven against her. We cannot agree. In making its best interest determination, the trial court relied primarily on Mother's admitted lack of a meaningful relationship with the Children, her neglect of the Children by drug abuse, her nonpayment of child support, and her visitation history. *See* Tenn. Code Ann. § 36-1-113(i)(3), (4), (6), & (9). Although we have concluded that Father is partially to blame for some of Mother's failure to visit the Children, overall, the evidence does not preponderate against the trial court's factual findings on the statutory factors. Because Mother failed to support the Children and admitted that this was intentional, the trial court properly found that this factor favored termination as to the best interest of the Children. Mother acknowledged that, by the time of trial, Father and Stepmother had been the Children's caregivers for nearly four years and that the Children were unaware Mother had given birth to another child. The Children call Stepmother their "mom," just as she treats them as her own Children, according to the testimony of several witnesses. The Children are strongly bonded to Father and Stepmother's extended family members who spoke about the excellent job Father and Stepmother have done raising these Children alongside their other child.

Based on these facts and the record as a whole, we conclude that clear and convincing evidence supports a finding that termination of Mother's parental rights is in the Children's best interest. Accordingly, we affirm the trial court.

# V.    CONCLUSION

The judgment of the trial court is affirmed in part and reversed in part.  The termination of Kara C.'s parental rights is affirmed.  The case is remanded for such further proceedings as may be necessary and consistent with this Opinion.  Costs of the appeal are taxed to the appellant, Kara C., for which execution may issue if necessary.

_____
JOHN W. McCLARTY, JUDGE